**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KNOLL, INC.,

                            Plaintiff,

            v.                                       **Case No. 12 Civ. 0921 (AKH) (KNF)**

REGENCY SEATING, INC. and
JOHN SUMMERVILLE,

                            Defendants.

---

**REGENCY'S BRIEF IN SUPPORT OF ITS MOTION TO**
**VITIATE PRIVILEGE BASED ON THE CRIME-FRAUD EXCEPTION**
**AND COMPEL PRODUCTION OF WITHHELD MATERIALS**

Defendant and Counterclaim-Plaintiff Regency Seating, Inc. ("Regency") hereby submits

this brief in support of its motion to vitiate privilege claims by Plaintiff and Counterclaim-

Defendant Knoll, Inc. ("Knoll") based on the crime-fraud exception.  As explained in detail

below, Regency alleges that Knoll committed fraud in prosecuting the asserted trademark

registrations, and are hiding evidence of their fraud behind the cloak of attorney-client privilege.

Regency requests an order requiring Knoll to produce documents logged on Knoll's privilege log

from March 1995 to September 2004 (documents 36-123), and July 2009 to June 2011

(documents 371-794), which reflect communications with Knoll's counsel to perpetrate the

fraud.  *See* Exhibit G.[1]

Knoll committed fraud on the United States Patent and Trademark Office on at least two

occasions.  First, when Knoll originally filed its applications for the asserted trademark

---

[1]      Exhibits cited are attached to the *Declaration of Natasha Sardesai-Grant in Support of
Regency's Brief in Support of Its Motion to Vitiate Privilege Based on the Crime-Fraud
Exception and Compel Production of Withheld Materials*, filed herewith.

registrations in 2003 (the "Applications," or individually, "Application"), it knowingly made false statements to the United States Patent and Trademark Office (the "USPTO") in connection with each Application.  Knoll falsely swore that it enjoyed "substantially exclusive" use of the claimed style of furniture as a trademark although it knew that other companies had been selling the same style of furniture for many decades.  Second, when Knoll sought incontestable status for its asserted registrations in 2010, Knoll falsely swore that there were no pending disputes involving its rights to the claimed style of furniture.  To the contrary, there were at least six federal court actions involving Knoll's rights that were never finally resolved.

Knoll's privilege log—the most recent of which is 128 pages with 906 entries—lists countless communications between Knoll and its counsel pertaining to the prosecution of the asserted trademark registrations.  Based on the timing and subject matter of these communications, the withheld documents reflect Knoll's effort to procure legal advice to perpetuate fraud on the USPTO.   Accordingly, Regency respectfully requests that this Court pierce attorney-client privilege to these communications pursuant to the crime-fraud exception, and compel Knoll to produce these withheld documents, at a minimum for *in camera* review.

## I.    Factual Background

Knoll did not design the furniture it now asserts against Regency.  In 1965, Knoll purchased the right to use Mies van der Rohe's name (the original designer) in connection with this style of furniture.  In 1968, Knoll acknowledged it owned no rights in the "visual design as such," which was in the public domain, but instead, Knoll sought to protect its use of the Mies van der Rohe name in connection with the furniture.  See Exhibit K.  Knoll sold the furniture under the trademark BARCELONA.

For a period for more than 20 years, Knoll watched as third parties sold the same style of competing furniture, including Palazetti LLC ("Palazetti"), Arthur Gordon Associates, Inc. ("Arthur Gordon"), Nouvo Melodrom, Sedia, Inc., Alivar, Brueton, and Design Within Reach Inc. ("DWR").  Knoll did not view or treat these third parties as infringers, but instead, as competitors.  *See* Exhibit N.  Beginning in around March 1995, Knoll consulted attorneys regarding its intellectual property for the furniture, and in 2000, Knoll began sending cease and desist letters to certain competitors, including Palazetti, only with respect to the use of the trademark BARCELONA.  *See* Exhibit A.  In 2000, Knoll made <u>no</u> claim to own rights in the product configuration for this style of furniture and did not demand that any of these companies stop selling the styles.  In response, Knoll's competitors snubbed its demands.  For example, Palazetti told Knoll that it had been selling the furniture "over the past twenty years."  *Id.*

### a.  Fraud in Acquiring the Mark

In July 2003, Knoll contacted the law firm of Gottlieb, Rackman & Reisman ("GRR"), regarding the possibility of protecting the product configuration—the geometrical shape and design—of this style of furniture.  Between July and October 2003, it is believed that GRR provided advice to Knoll on the protection of the product configuration of the furniture, and on October 22, 2003, GRR filed the Applications on Knoll's behalf.  *See* Exhibit H.[2]

Although trademark protection may be secured for "product configurations," the configuration of a product can never be inherently distinctive.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000).  To obtain a registration, an applicant must show that the

---

[2]      The applications include the following: Serial No. 76/556,821, which issued as U.S. Trademark Registration 2,894,979; Serial No. 76/556,819, which issued as U.S. Trademark Registration 2,894,978; Serial No. 76/556,817, which issued as U.S. Trademark Registration 2,893,025; Serial No. 76/556,816, which issued as U.S. Trademark Registration 2,894,977; Serial No. 76/556,824, which U.S. Trademark Registration 2,894,980.

product configuration has acquired distinctiveness through substantially exclusive and continuous use, i.e., secondary meaning. *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1349-50 (Fed. Cir. 2010).

In this case, Knoll could only obtain a trademark registration for this style of furniture by demonstrating that the public recognized it as the sole source for this style of furniture based on its long-standing exclusive sales of the furniture. Although false, Knoll was forced to claim that the style of its furniture had become distinctive "by reason of substantially exclusive" use, which it did in its October 2003 Applications:

> The mark has become distinctive by reason of substantially exclusive and continuous use in interstate commerce by applicant and its predecessors in interest as to the rights herein claimed in connection with the goods listed in the application for at least five (5) years preceding the date of this application.

*See* Exhibit B. This statement is false for the simple reason that Knoll knew about numerous third parties selling the same style of furniture, including Palazetti, Arthur Gordon, Sedia, Alivar, Brueton, and DWR. The table below sets forth some of the third parties selling the same furniture, just before Knoll filed the Applications.

| Date | Evidence |
|---|---|
| Beginning in the 1980s | **Palazetti** sold the same style of furniture under the BARCELONA mark for 20 years beginning in the 1980s. *See* Exhibit A. ("Our client has used the term 'Barcelona' to identify a particular reproduction of a Mies van der Rohe chair design for the past twenty years."); *see also* Exhibits M and N. |
| Beginning in the 1980s | **Sedia** sold the same style of furniture for 20 years beginning in the 1980s, as evidence by a letter from Sedia's counsel to Knoll. *See* Exhibit C ("Sedia had "been distributing furniture inspired by classic Mies van der Rohe designs for over 20 years," and Knoll had "been aware of Sedia's continuous sales of these products since at least the early 1980s, when it sent an earlier letter claiming the exclusive right to use the name BARCELONA in connection with its furniture.") |

| Date | Evidence |
|---|---|
| Beginning in the 1990s | **Arthur Gordon** sold the same style of furniture for years, and Knoll was fully aware of them. *See* Exhibits E, M, and N. The Museum of Modern Art apparently used Arthur Gordon's furniture instead of Knoll. Exhibit F. |
| Beginning in the 1990s | **Nouvo Melodrom** sold the same style of furniture for years, and Knoll was aware of them. *See* Exhibit N. |
| Sometime before 2000 | **Design Within Reach** sold the same style of furniture under the BARCELONA mark. *See* Exhibit L (cease and desist letter from Knoll to DWR). Although DWR apparently agreed to not use the name BARCELONA, DWR continued selling the furniture until at least October 2004. |
| Sometime before 2003 | **Alivar** and **Brueton** sold the same style of furniture. *See* Exhibit E (internal Knoll memo identifying Alivar, Palazetti, Brueton, and Arthur Gordon as "knock-offs" about which they were already aware). |

Relying on Knoll's false statement, the USPTO issued trademark registrations for the furniture in October 2004. *See* Exhibit B. The actual registrations are powerful because they created a presumption that Knoll actually owned rights to this style of furniture, thereby shifting the legal burden to Knoll's competitors to show that the style of furniture belonged to the public domain. Before obtaining the registrations, Knoll could not have sued competitors without itself first proving that it actually owned rights in the designs.

Armed with fraudulently acquired trademark registrations, Knoll could now attempt to intimidate its competition by threatening federal lawsuits against them. Starting in 2004, Knoll began its campaign of suing its competitors based on the registrations.

**b.  Fraud in Obtaining Incontestable Registrations**

In early 2010, Knoll was still asserting its trademark registrations against competitors. Knoll, however, realized that it had the opportunity to request from the USPTO that its registrations be given "incontestable" status pursuant to 15 U.S.C. § 1065. A trademark can obtain "incontestable" status if the registrant can demonstrate that the mark has been used for five consecutive years subsequent to the date of such registration and is still in use in commerce,

provided that (i) there has been no final decision adverse to the owner's claim of ownership of such mark for the goods or services, or to the owner's right to register the same or to keep the same on the register; (ii) there is no proceeding involving said rights pending in the USPTO or in a court and not finally disposed of; (iii) the appropriate sworn to affidavit regarding use is made; and (iv) that the mark is not generic for the particular goods or services. *Id.* Despite its name, a registration that attains "incontestable" status may still be contested for fraud, abandonment, and other deficiencies.  15 U.S.C. § 1115(b)(1)-(9).

To obtain "incontestable" status, Knoll needed to submit to the USPTO "Section 8 and 15 Declarations of Use and Incontestability " for each registration confirming, *inter alia*, "there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not **finally** disposed of. . . ."  15 U.S.C. § 1065 (Sec. 15) (emphasis added).  At the time in 2010, however, Knoll was embroiled in at least six district court litigations involving its registrations:  It could not declare there were no proceedings involving Knoll's rights in the furniture.

To falsely give the impression to the USPTO that there were no proceedings involving Knoll's rights in its furniture, Knoll began dismissing the district court litigations without prejudice as shown in the table below:

| Dismissal Date | Case |
|---|---|
| Mar. 19, 2010 | *Knoll, Inc. v. Efstyle.com*, No. 2009-cv-05353 (E.D.N.Y. filed Dec. 8, 2009) (voluntary dismissal without prejudice) |
| Mar. 30, 2010 | *Knoll, Inc. v. Danrick Commerce Group*, LLC et al, No. 2008-cv-00778 (N. D. Cal. filed Feb. 1, 2008) (joint voluntary dismissal without prejudice)[3] |

---

[3]     Defendant asserted a counterclaim for cancellation of the registrations but agreed to dismiss them.

| Dismissal Date | Case |
|---|---|
| Apr. 2, 2010 | *Knoll, Inc. v. Mod Lines By Design, LLC*, No. 2009-cv-10536 (S.D.N.Y. filed Dec. 29, 2009) (voluntary dismissal without prejudice) |
| Apr. 2, 2010 | *Knoll, Inc. v. The Sofa Company*, No. 2009-cv-08157 (S.D.N.Y. filed Sept. 24, 2009) (voluntary dismissal without prejudice) |
| Apr. 2, 2010 | *Knoll, Inc. v. Hightechseating LLC*, No. 2009-cv-08298 (S.D.N.Y. filed Sept. 30, 2009) (voluntary dismissal without prejudice) |
| Apr. 8, 2010 | *Knoll, Inc. v. Shopseating.com*, No. 2009-cv-04408 (E.D.N.Y. filed Oct. 14, 2009) (joint voluntary dismissal without prejudice) |

*See* Exhibit I (the dismissal of each of these cases).

On April 8, 2010, the same day the District Court for the Eastern District of New York dismissed the Shopseating.com case, Knoll submitted to the USPTO declarations signed by Michael Pollner, Vice President, General Counsel and Secretary of Knoll, stating that "there is no proceeding involving said rights pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts." *See* Exhibit H. This is false for the simple reason that Knoll knew of at least the above six cases that were not finally disposed of—they were just hidden from the USPTO via a dismissal without prejudice. After obtaining the "incontestable" status for its registrations, Knoll quickly went back to trying to stop these third parties.

### c.  Procedural History

Knoll has withheld most of the documents pertaining to its trademark applications as privileged, and Knoll refused to produce a privilege log until the Court ordered Knoll to produce one on December 14, 2012. After several meet and confers between the parties, Knoll produced a "rough" privilege log with 195 entries on January 8, 2013, along with a legend. On January 23, Knoll produced a more complete privilege log with 1,174 entries. After reviewing it, on January 25, Regency's counsel requested more specificity in the descriptions of the subject matter and questioned the legitimacy of the privilege claim for number of the entries. On

January 28 and 29, Knoll produced more than six thousand pages of documents previously withheld as privileged, and on January 30, Knoll produced another revised privilege log containing 886 entries.

On January 30, 2013, counsel for the parties met and conferred yet again regarding Knoll's privilege log.  Regency contended that the privilege log and legend were still deficient, and failed to identify the individuals who authored or received the communications.  Regency also contended that based on the timing and subject matter of the withheld documents, certain logged communications were made in the furtherance of the alleged fraud and were not subject to privilege.  Regency requested that Knoll produce the documents for inspection on its attorney's eyes only basis, but on February 1, Knoll responded that it "will not agree to turn over the privileged documents you identified during the call for review by Regency's counsel."  *See* Exhibit J.

On February 5, 2013, Knoll produced another revised legend for its privilege log, and on February 12, Knoll produced yet another revised privilege log and legend.  The February 12 privilege log—the most recent iteration— contains 906 entries.  *See* Exhibit G.  Knoll also produced additional documents.  Because Knoll's privilege log only includes abbreviations for individuals, and separately provides a "legend" to decipher who those individuals are, Regency provides a translated version of Knoll's privilege log for the Court's convenience which incorporates the actual names of the individuals into the document.  *See* Exhibit O.[4]

---

[4]     To this day, Knoll's privilege log and legend contain deficiencies.  For example, Knoll's legend does not identify "KK," who is listed on the privilege log.

## II.      Legal Standard for Crime Fraud

A client enjoys no attorney-client privilege for communications with counsel made in the furtherance of fraud.  *Clark v. United States*, 289 U.S. 1, 15 (1933).  The privilege is not meant to protect communications intended to foster criminal, fraudulent, or tortious conduct.

To pierce the privilege claim, a party challenging privilege must establish (1) a *prima facie* case of fraud; and (2) that the attorney-client communications were made in furtherance of fraud.  *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1052 (D. Del. 1985) (involving fraud on the patent office).  The elements of fraud in the context of acquiring trademarks from the USPTO are as follows:

(1) A false representation regarding a material fact;

(2) Knowledge or belief that the representation is false;

(3) An intention to induce the listener to act or refrain from acting in reliance upon the misrepresentation;

(4) Reasonable reliance upon the misrepresentation; and

(5) Damage proximately resulting from such reliance.

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 425 F. Supp. 2d 458, 467-68 (S.D.N.Y. 2006) (citing 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 31.21(2)(a) at 31:96 (4th Ed. 2004); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1353 (E.D.N.Y. 1994)).  *See also In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009).  "[A]ffirmative acts of egregious misconduct" by a prosecuting attorney before the USPTO "such as the filing of an unmistakably false affidavit" to be inherently material.  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.2d 1276, 1292 (citing

*Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983); *Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1996)).

III.    **Knoll Committed Fraud on the Trademark Office to Obtain the Asserted Registrations in 2003 When It Claimed to Enjoy "Substantially Exclusive" Use of the Asserted Designs**

A *prima facie* case of fraud is made here.  When it filed its trademark applications in October 2003, Knoll falsely told the USPTO that "[t]he mark has become distinctive by reason of substantially exclusive and continuous use."  *See* Exhibit B.  This statement is false; Knoll knew it was false; Knoll intended to induce the USPTO to issue trademark registrations based on the false statement; and the USPTO relied on the false statement to issue the registrations.[5] Knoll knew that at least Palazetti, Sedia, Arthur Gordon, Nouvo Melodrom, Design Within Reach, Alivar, and Brueton, had been selling the same style of furniture.  Knoll hid this fact from the USPTO and stated the opposite when it swore that the furniture had become distinctive by its exclusive use of this style.

In committing fraud on the USPTO, Knoll sought legal advice on how to perpetuate this fraud.  These communications, however, are being concealed behind the attorney-client privilege, and based on the crime-fraud exception to the attorney-client privilege, Regency seeks the production of privilege log documents dated from March 1995 to September 2004 (documents 36-123).

Based on Knoll's privilege log, Knoll apparently began consulting attorneys for advice in around 1995.  *See* Exhibit G.  After unsuccessfully sending cease and desist letters in 2000 to

---

[5]       A USPTO examiner considers only registered trademarks and prior-pending trademark applications when examining a trademark application.  An examiner does not consider earlier common-law use, state registrations, and other claims based on evidence other than federal trademark registrations and prior-pending trademark applications.  Trademark Manual of Examining Procedure § 1715.01(b), United States Patent and Trademark Office (Oct. 2012).

Palazetti and others, Knoll hired the GRR law firm in 2003, and between July and October 2003 (when the trademark applications were filed), GRR apparently advised Knoll on the protection of the product configuration of the furniture.  According to Knoll's privilege log, the first communication with GRR occurred on July 11, 2003.  *See* Exhibit G at page 10, entry 55.  The email subject line of this communication is "Barcelona –Trade Dress."  Before this, Knoll's efforts were directed to the BARCELONA trade mark, not "trade dress" or "product configuration."

Below are examples of the types of documents on Knoll's current privilege log that conceal communications related to the false statement to the USPTO.

Privilege log entry 61 is an August 21, 2003, internal Knoll email with the subject line "Barcelona and Wassily Knock-Off Presentations" and subject matter "E-mail re: Intellectual Property Enforcement."  Knoll clearly discussed the impact of Knoll's competitors—which it referred to as "knock-offs"—on their trademark applications for the design of the furniture.  The following day, on August 22, Knoll employees wrote in another internal email the following:

Redacted

*See* Exhibit E.

This document shows that in August 2003, just two months before Knoll filed its trademark applications, Knoll obtained advice from counsel that to obtain a trademark registration, it had to establish substantially exclusive use, i.e., Knoll had to show that style of furniture has "been identified with Knoll."  Knoll apparently compiled a list of third parties

selling the same style of furniture.  Despite knowing about third parties, two months later, Knoll turned around and told the USPTO that it was the exclusive seller of this furniture.[6]

One month before filing its trademark applications, Knoll continued to compile a list of its competitors.  Privilege log entry 66 is a September 3, 2003, internal Knoll email with the subject line "List of Knock-Off Entities: Barcelona, Brno."  *See* Exhibit G and O.  Privilege log entry 85 is a September 18, 2003, email to outside counsel with the subject line: "Re: Mies van der Rohe/Knoll) [sic] Knockoffs."  *Id.*  Numerous emails among parties at Knoll and counsel for Knoll dated September 2003, concern "Declarations/Trademark Applications for Mies Designs" and "Table and Stool Declarations."  *See* Exhibits G and O (Documents 83, 84, and 87- 96.)

Based on the date and description of the privilege log documents, Regency requests production of all documents dated between March 1995 and September 2004 (documents 36-123).  Because Knoll sought legal advice to perpetuate its fraud upon the USPTO, these documents should enjoy no attorney-client privilege.

### IV. Knoll Committed Fraud on the Trademark Office in 2010 When It Claimed That There Were No Pending Disputes Involving Its Alleged Trade Dress in Order to Obtain Incontestability of Its Asserted Registrations

Like before, a *prima facie* case of fraud is made here.  When Knoll submitted its Section 8 and 15 Declarations of Use and Incontestability, Knoll falsely swore under penalty of fine or imprisonment that "there is no proceeding involving said rights pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts."  *See* Exhibit H.  There were proceedings involving Knoll's registrations, however, Knoll hid them from the USPTO by voluntarily dismissing them weeks earlier.  *See* Exhibit I.  The last of the six was dismissed on

---

[6]     According to Knoll, Carl Magnusson (a former employee of Knoll) was the individual who made the false statement to the USPTO. See Exhibit P (Knoll's response to Regency's Interrogatory No. 1.)  Mr. Magnusson was copied on the August 22, 2003, email enumerating all the third parties selling the same furniture.

April 8, 2010, the same day Knoll filed its false declarations.  These eleventh hour voluntary dismissals were deliberately orchestrated by Knoll and its counsel with the intention of misleading the USPTO to believe that there were no disputes as to its rights in the asserted designs.  Just as Knoll had intended, the examiner reasonably relied on Knoll's knowingly false declarations designed to create the false impression that the registrations were entitled to incontestable status.

Knoll may contend that the cases were simply settled as a matter of course, and that the settlements coincidentally occurred right before the Section 8 and 15 Declarations of Use and Incontestability.  This, however, is contradicted by the fact that after dismissing Shopseating.com on April 8, 2010, Knoll apparently continued to pursue Shopseating.com as shown by privilege log entries 704 (February 7, 2011), 723 (March 29, 2011), and 790-791 (June 23, 2011).  These are email communications regarding Shopseating.

In committing fraud on the USPTO, Knoll sought legal advice on how to perpetuate this fraud.  These communications are being concealed behind the attorney-client privilege, and based on the crime-fraud exception to the attorney-client privilege, Regency seeks the production of privilege log documents dated from July 2009 to June 2011 (documents 371-794).

A partial review of the file history for Registration No. 2,893,025, shows the timeline precisely with respect to the fraud committed on the PTO:

| | | |
|---|---|---|
| Feb. 21, 2013 | NOTICE OF SUIT | |
| Jun. 16, 2011 | NOTICE OF SUIT | |
| May 11, 2010 | NOTICE OF SUIT | |
| Apr. 22, 2010 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | 68502 |
| Apr. 22, 2010 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | 68502 |
| Apr. 08, 2010 | TEAS SECTION 8 & 15 RECEIVED | |
| Apr. 05, 2010 | TTAB RELEASE CASE TO TRADEMARKS | 51592 |
| Apr. 05, 2010 | CANCELLATION TERMINATED NO. 999999 | 51592 |

| Apr. 05, 2010 | CANCELLATION DISMISSED NO. 999999 | 51592 |
| Feb. 18, 2010 | NOTICE OF SUIT | |
| Jan. 05, 2010 | NOTICE OF SUIT | |
| Dec. 30, 2009 | NOTICE OF SUIT | |
| Oct. 21, 2009 | NOTICE OF SUIT | |
| Oct. 21, 2009 | NOTICE OF SUIT | |
| Oct. 16, 2009 | NOTICE OF SUIT | |
| Oct. 16, 2009 | NOTICE OF SUIT | |
| Oct. 16, 2009 | NOTICE OF SUIT | |
| Oct. 15, 2009 | NOTICE OF SUIT | |
| Oct. 14, 2009 | CANCELLATION INSTITUTED NO. 999999 | 51592 |
| May 22, 2008 | NOTICE OF SUIT | |
| May 20, 2008 | NOTICE OF SUIT | |

Excerpts from the prosecution histories of the Applications are attached hereto as Exhibit B.

Numerous entries on Knoll's privilege log support Regency's position.  Documents 545 through 550 reflect a chain of email correspondence between April 1 and 8, 2010, between Knoll and its counsel with subject lines such as "Re: Dismissal Status/ BARCELONA Filing," "Dismissals of third party litigations," and "Filing of Section 8 & 15 Declarations."  These documents, among others, suggest that Knoll intended to knowingly defraud the USPTO and to obtain incontestable status for each of its asserted registrations under false pretenses.  Subsequently and less than three weeks after Knoll's fraudulent filings, there is a logged email with the subject line "Cease & Desist," which clearly reflects correspondence between Knoll and its attorneys resuming its ongoing enforcement activities involving its alleged rights once the fraudulent declarations had served their intended purpose.

Based on the date and description of the privilege log documents, Regency requests production of all documents dated from July 2009 to June 2011 (documents 371-794).  Like before, because Knoll sought legal advice to perpetuate its fraud upon the USPTO, these documents should enjoy no attorney-client privilege.

**V.      Conclusion**

Knoll should not be able to hide its fraud behind the attorney-client privilege.  For the reasons explained herein, Regency respectfully requests an order compelling Knoll to produce the privilege log documents between March 1995 and September 2004 (documents 36-123), and between July 2009 and June 2011 (documents 371-794).

The burden to obtain an in-camera review of documents is less than the burden to vitiate privilege.  *U.S. v. Zolin*, 491 U.S. 554, 572 (1989) (party must make a "showing of a factual basis adequate to support a good faith belief by a reasonable person. . . that in camera review of the materials may reveal evidence the claim that the crime-fraud exception applies.").  Here, production should be ordered without an in-camera review given the *prima facie* case of fraud established by Regency.  However, if an in-camera review is necessary for the Court's decision on this motion, Regency requests such a review.

Dated:   New York, New York.
         February 28, 2013

Respectfully submitted,

KENYON & KENYON LLP

Michelle Mancino Marsh (MM 1494)
Natasha Sardesai-Grant (NS 1130)
One Broadway
New York, New York 10004
212-908-6180
mmarsh@kenyon.com
nsardesai@kenyon.com

SEED IP LAW GROUP PLLC
Michael J. Freno (MF 6969)
Kevin Costanza (*pro hac vice*)
701 Fifth Avenue, Suite 5400
Seattle, Washington 98101
206-622-4900
mikef@seedip.com

*Counsel for Defendants and Counterclaim-Plaintiffs*
*Regency Seating, Inc. and John Summerville*