UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KNOLL, INC.,<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>REGENCY SEATING, INC. and<br>JOHN SUMMERVILLE,<br><br>　　　　　　　　Defendants. | Case No. 12 Civ. 0921 (AKH) (KNF)<br><br>ORAL ARGUMENT REQUESTED |

**REGENCY'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO
VITIATE PRIVILEGE BASED ON THE CRIME-FRAUD EXCEPTION
AND COMPEL PRODUCTION OF WITHHELD MATERIALS**

Defendants and Counterclaim-Plaintiffs Regency Seating, Inc. and John Summerville (together, "Regency"), submit this Reply Brief in support of *Regency's Motion to Vitiate Privilege* (D.I. 27, hereinafter the "Motion").

In its Opposition (D.I. 32), Knoll does not deny that it knew that numerous third parties openly and notoriously sold the same style of furniture for more than 20 years before it filed for trademark protection in 2003. Knoll also does not deny that in 2010 it knew about disputes with third parties over its trademark rights when it sought incontestable status for its registrations. Knoll hid both of these facts from the United States Patent and Trademark Office ("PTO"); it told the PTO the opposite; and it walked away with trademark registrations covering generic furniture designs. This is not speculation; these are facts.

Knoll tells a complicated story in its Opposition to justify hiding highly damaging information from the PTO. Knoll wrongly asserts that it was permitted to conceal such facts from the PTO. But it stands to reason: If Knoll had nothing to hide, it would have told the PTO in

2003 that third parties had been selling the same furniture for more than 20 years, instead of telling the PTO that it enjoyed "substantially exclusive use" of the designs. If Knoll had nothing to hide, it would have told the PTO in 2010 that numerous third parties were disputing its rights over the designs, instead of the telling the PTO "there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not **finally** disposed of." The same goes for documents Knoll is now shielding from Regency.

If Knoll has nothing to hide, it should show Regency and the Court the documents in an *in camera* review. The easiest way for Knoll to defuse the allegation of fraud would be to come clean. Knoll insists, however, on hiding thousands of pages of documents. The documents should speak for themselves. *Clark v. United States*, 289 U.S. 1, 15 (1933).[1]

### I.  PROBABLE CAUSE STANDARD

Regency need not prove fraud to vitiate privilege. Regency need not even prove a *prima facie* case of fraud; instead, Knoll concedes that the standard for vitiating privilege merely requires "probable cause" to believe fraud has been committed. (Opposition at 11 (citing *United States v. Jacobs*, 117 F.2d 82, 87 (2d Cir. 1997) (affirming vitiation of privilege))). *See also Amusement Indus., Inc. v. Stern*, No. 07-11586, 2013 WL 498724, at *2 (S.D.N.Y. Feb 11, 2013) (vitiating privilege).[2]  This Court recently explained the standard thus:

> "Probable cause" in the context of the crime/fraud exception requires that a "prudent person" have a "reasonable basis" for believing that the objective of the client's communication with the attorney was to further a fraudulent scheme. . . .[T]he party seeking to pierce the privilege should demonstrate a "substantial reason" to believe that the party seeking to preserve the privilege "engaged in or attempted to commit a fraud and used communications with its attorney to do so. . . ." In the end, "the probable cause

---

[1] "There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark*, 289 U.S. at 15.

[2] Other courts have required a "prima facie" case of fraud. *Stirum v. Whalen*, 811 F. Supp. 78, 82 (N.D.N.Y. 1993) (piercing privilege under the prima facie case standard); *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1052 (D. Del. 1985) (same). The attorney-client privilege is based on federal common law. Fed. R. Evid. 501.

necessary to sustain the exception is not an overly demanding standard."

*Id*. at *3-4 (citations omitted).

## II.     FIRST FRAUD – LYING TO THE PTO ABOUT EXCLUSIVE USE

Knoll's motive to lie to the PTO in 2003 was immense. Knoll had to prove distinctiveness to get registrations, and Section 2(f) of the Trademark Act allowed "proof of substantially exclusive and continuous use" to be accepted as *prima facie* evidence that the mark has acquired distinctiveness. 15 U.S.C. § 1052(f). *See also* 37 C.F.R. § 2.41(b); *Wal-Mart Stores, Inc. v. Samara Bros., Inc*., 529 U.S. 205 (2000) (product configuration is never inherently distinctive). In short, Knoll had to tell the PTO that it enjoyed "substantially exclusive use" to obtain registrations for the designs.

As the Federal Circuit explained previously, however, "[w]hen the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a . . . device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances." *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1403 (Fed. Cir. 1984). *See also Nextel Commc'ns, Inc. v. Motorola, Inc.*, 91 U.S.P.Q.2d (BNA) 1393, 1408 (T.T.A.B. 2009) (finding opposer's use of the mark rebutted applicant's contention of substantially exclusive use); Trademark Manual of Examining Procedure ("TMEP") § 1212.05(b) (9th ed. Oct. 31, 2012). Because the record shows numerous independent users of the same style of furniture, including Palazetti, ▬▬▬, Arthur Gordon, Melodrom, Brueton, Sedia, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and more recently Design Within Reach ("DWR"), Knoll's applications under Section 2(f) should not have been successful—except for the fact that Knoll lied about its "substantially

3

exclusive use." *See e.g.*, Pollner, Ex. 24, 28. If Knoll told the truth, it would never have received the registrations.[3] *See, e.g.*, *Rosso & Mastracco, Inc. v. Giant Food Inc.,* 720 F.2d 1263, 1266 (Fed. Cir. 1983) (trademark applicant's oath "must be truthful," and "a senior user would be making a false oath where he fails to acknowledge conflicting rights of a junior user").

By 2003, the same style of furniture was being sold by so many third parties for so long that the public could not assume that a piece of this style of furniture in a doctor's office, a mall, or even a museum originated from Knoll and not one of the third parties. Much to Knoll's embarrassment, for years MoMA used Arthur Gordon versions of the furniture, not Knoll's.[4] In its Opposition, Knoll tries to justify its decision to conceal more than 20 years of third party sales of the same furniture by insisting that it "had no obligation to report any third parties to the Trademark Office." (Opposition at 15-16.) Knoll claims that so long as it subjectively believed that these third parties were "infringers," Knoll could hide their existence from the PTO.[5] This is wrong.

Willful blindness surpasses recklessness and negligence. A willfully blind applicant is one who takes deliberate actions to avoid confirming the high probability that a sworn statement is false, satisfying the *mens rea* to support a determination of fraud. *Global-Tech Applicances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71 (2011); *see also Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 151 F Supp. 2d 1192, 1205, 1211 (C.D. Cal. 2001) (finding that a patentee's

---

[3] PTO examiners only consider registered trademarks and prior-pending applications when examining applications; they do not consider other evidence. TMEP § 1715.01(b). The PTO relies heavily on applicants' statements when issuing registrations. "[T]he obligation which the Lanham Act imposes on an applicant is that he will not make *knowingly* inaccurate or *knowingly* misleading statements in the verified declaration forming a part of the application for registration." *Bartz Schwartz Int'l Textile, Ltd. v. Fed. Trade Comm'n*, 289 F.2d 665, 669 (C.C.P.A. 1961).

[4] Knoll tried to downplay this fact in its Opposition by asserting hearsay. (Opposition at 6 & n.4.) First, the cited evidence is Knoll's own document (with the facts confirmed in Pollner Ex. 31); and second, the Court can consider even inadmissible evidence to decide discovery disputes. *See, e.g.*, *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207 (Fed. Cir. 1987).

[5] Knoll relies on *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349 (Fed. Cir. 1999), for the proposition that infringing use by a third party does not preclude an applicant's statement of substantially exclusive use. However, the Federal Circuit remanded the case back to the district court for a determination of whether the third party use was inconsequential or infringing. Ultimately, the court found that the registration at issue was "obtained by fraud."

willful blindness and resulting failure to notify the PTO of a material error was "clear and convincing evidence that [the patentee] committed inequitable conduct and was not acting in good faith). For this motion, Regency need only demonstrate "probable cause," and "[t]he fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause." *Amusement Ind.*, 2013 WL 498724, at *4.

Moreover, contrary to Knoll's protestations, until it obtained its fraudulent registrations, for decades Knoll treated the third parties as "competitors" who caused them ▓▓▓▓▓ ▓▓▓▓▓ (Pollner Ex. 15 and Sardesai Decl., Ex. M and N.) Before 2003, Knoll never sent a single letter demanding that those parties cease and desist selling the alleged designs; it only complained about the use of the *BARCELONA word mark*.[6] Accordingly, there would be no reason any of these third parties would have need to establish their rights by court decree or settlement – twenty years of unchallenged use is *ipso facto* "clearly established use."

In a 1989 memo, Knoll states that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ The proposed solution was not to enforce design rights but instead ▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Pollner Ex. 19). Knoll's own documents prove that Knoll's competitors were taking significant market share and it was Knoll who enjoyed only modest sales due to their very high price points. *See* Pollner Exs. 15, 19, 24, 28; Misthal, Ex. 2b (Needle ¶15) (*e.g.,* Knoll sold ▓▓▓ Barcelona couches per year over ▓ years).

Knoll implies that so long as it "believed" third parties were infringers, it did not need to

---

[6] Until 2004, Knoll only asserted trademark infringement of the BARCELONA word mark. After fraudulently obtaining registrations, they changed tactics and asserted design registrations. For example, in 2000, Knoll complained about ▓▓▓▓▓ use of the BARCELONA trademark. (Pollner Decl., Ex. 2.) After fraudulently acquiring the trademark registrations in 2004, Knoll went back and complained about ▓▓▓▓▓▓▓ *Id*. In 2000, Knoll complained about ▓▓▓▓ use of the BARCELONA trademark. (Pollner Ex. 10.) Then, after 2004, Knoll went back to ▓▓▓ about the designs, stating, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Pollner Ex. 10.) In 1981, Knoll complained about ▓▓▓ use of the BARCELONA trademark. (Pollner Decl. at ¶ 14; *see* Pollner Ex. 7.) After 2004, Knoll went back and complained about ▓▓▓▓▓▓▓ in 2005. (Pollner Ex. 8.)

disclose these facts to the PTO. But by 2003, the "Barcelona" style of furniture belonged to the public— to quote a Knoll employee in a circa 1988 memo, the issue of design protection was a ▬▬▬▬▬▬▬ (Pollner Ex. 15; Pollner Decl. ¶ 27.) If Knoll truly believed it owned superior right to the designs before it filed for trademark protection, it would have asserted those rights in the decades prior. Knoll's silence speaks volumes.

Even assuming that Knoll ever owned any rights in the "product configuration" of the furniture, Knoll's acquiescence to more than 20 years of third party use of the same styles resulted in abandonment of those rights: "A mark shall be deemed to be 'abandoned' . . . [w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark." 15 U.S.C. § 1127(2). "Competitor use is evidence of genericness." *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565 (Fed. Cir. 1995); *Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp.*, 94 U.S.P.Q.2d (BNA) 1549, at *50 (T.T.A.B. 2009) (applicant never policed the body shape, only the word marks and headstock profiles rendering the shapes generic).

By 2003, when Knoll told the PTO that it enjoyed "substantially exclusive use," the "Barcelona" furniture designs were already abandoned and belonged in the public domain. Because the designs belong to the public, Knoll had no priority and could not reasonably believe it owed superior rights.

In a bit of wishful thinking, Knoll acts as if it was already vindicated of fraud in the case of *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1131 (N.D. Cal. 2009). In that case, Alphaville sued Knoll for a declaratory judgment that the same trademark registrations were invalid, including based on fraud. The court denied summary judgment of fraud, but never

vindicated Knoll. First, the court found a material issue of fact on fraud worthy of a jury determination. Second, the court applied the Rule 56 standard for fraud in denying summary judgment; it did not ask merely whether there was "probable cause" that Knoll committed fraud. Third, Knoll's current position that it "had no obligation to report any third parties to the Trademark Office" because it always viewed them as "infringers" is facially contradicted by the record.[7]

### III.  SECOND FRAUD – LYING TO THE PTO ABOUT THE LACK OF DISPUTES OVER ITS RIGHTS TO THE DESIGNS

Knoll swore to the PTO that there were no pending proceedings "not disposed of" in April 2010 in order to secure "incontestable status." Knoll admits that one month prior, however, in March 2010, there were at least seven district court actions pending in which Knoll asserted its fraudulently acquired registrations, including cases against Danrick Commerce, The Sofa Company, Hightechseating LLC, Shopseating.com, Efstyle.com, Mod Lines by Design, and Alphaville's declaratory judgment action against Knoll. In April 2010 Knoll swore that "no proceeding involving said right pending and **not disposed of** in either the U.S. Patent and Trademark Office or the court exists." (Sardesai Decl, Ex. H.)[8]

There is probable cause to believe that Knoll willfully hid the fact that it voluntarily dismissed the cases without prejudice under Rule 41(a)(1)(A)(i) and never finally disposed of the many disputes challenging Knoll's rights to its trademark registrations. A dismissal without prejudice allowed Knoll to temporarily hide the cases from the PTO, while preserving the option

---

[7] Alphaville relied heavily on the 1968 letter wherein Knoll states that the designs are in the "public domain." *See generally*, *Alphaville Design*, 627 F. Supp. 2d at 1131-32. While this letter is probative, Regency has presented much more evidence. Regency has reason to believe that Alphaville did not have all of the documents presented here, and Alphaville certainly did not have the benefit of the documents contained in the privilege log.

[8] The Lanham Act required Knoll to declare that "there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and **not finally disposed of**." 15 U.S.C. § 1065(2).

7

to refile the case after obtaining the incontestability status of its registrations.[9] Knoll did not **finally dispose of** the various disputes; it swept them under the rug to deceive the PTO into granting it "incontestable" registrations.[10]

Knoll insists that odd timing of the dismissal of its infringement actions against The Sofa Company, Hightechseating, Efstyle.com, and Mod Lines by Design immediately prior to filing its Section 15 declarations was a mere coincidence. (Opposition at 18.) Knoll claims that it dismissed those actions because the defendants "did not file answers"; this is highly misleading. In two of those cases, the defendants still had time to file an answer when Knoll dismissed the case.[11] *Knoll, Inc. v. B.I.G. Furniture, Inc.*, No. 09-8157, D.I. 12 (S.D.N.Y. March 12, 2010); *Knoll, Inc. v. Mod Lines by Design, LLC*, No. 09-10536, D.I. 5 (S.D.N.Y March 5, 2010). It is also misleading because Knoll should have requested a default judgment (which could be vacated) instead of voluntarily dismissing the case without prejudice.[12] In fact, Knoll's voluntary dismissal of these actions allowed the "infringers" to continue selling the accused products. Each of the defendants continued to sell the accused products before, during, and after Knoll filed its Section 15 declaration with the PTO, and **Efstyle.com continues to sell the accused designs to this day**. (Marsh Declaration, Exhibit R.) Efstyle.com disputes Knoll's registrations by selling the accused furniture years after Knoll's voluntary dismissal of infringement claims against it.

---

[9] "Incontestability" is a reward to trademark registrants who quiet title over its ownership of a mark after five years of registration. *See Park'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985). After five years, the trademark registrant confirms to the PTO that it is recognized as the undisputed, exclusive owner. The Lanham Act requires that there be no proceeding involving the rights and "not finally disposed of."

[10] Apart from the actual litigations, Knoll sent at least ▮ cease and desist letters to other third parties in February of 2010. (Declaration of Michelle Mancino Marsh [hereinafter, "Marsh Declaration", Exhibit A.)

[11] In one of the cases, Knoll had consented, and the parties had jointly stipulated, to extensions of time for the defendant to answer that would not terminate until after Knoll filed its voluntary dismissals. *Knoll, Inc. v. B.I.G. Furniture, Inc.*, No. 09-cv-8157, D.I. 12 (S.D.N.Y. March 12, 2010).

[12] In one case, this Court actually ordered Knoll to request an entry of default. *Knoll, Inc. v. Efstyle.com*, No. 09-5353 (S.D.N.Y. Feb. 16, 2010).

For Danrick and Shopseating.com, Knoll contends that it dismissed those cases as part of a settlement agreement with Alphaville. (Opposition at 18-19.) The March 29, 2010, timing of this settlement with Alphaville (after years of litigation with Alphaville) is no coincidence—without the settlement, Knoll could not have requested incontestable status in April 2010.[13]

In April 2010, when Knoll signed its Section 15 declaration and told the PTO it had quieted title over its ownership of the Barcelona style furniture designs, Knoll knew that numerous third parties openly and notoriously flouted Knoll's alleged rights. Knoll's decision to voluntarily dismiss district court actions on the eve of its declaration to hide these challenges to Knoll's rights creates probable cause that Knoll hid this information to deceive the PTO. The fact that Knoll has allowed Efstyle.com to continue selling the same furniture demonstrates that Knoll did not **finally dispose of** a dispute challenging its trademark rights.

## IV.  KNOLL CONSULTED WITH COUNSEL TO PERPETRATE THE FRAUD

The crime-fraud exception removes the privilege from those communications that relate to client communications in furtherance of fraudulent conduct. *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994). Knoll does not contest that the hidden documents concern its filing of its Applications and Section 15 declarations. The hidden documents concern the very acts Regency asserts to be fraudulent.

Knoll's privilege log tells the story of its fraud. After unsuccessfully asserting the BARCELONA word mark against Palazetti and others in 2000, Knoll sought advice from counsel (Doc. 46). In June 2003, Carl Magnusson mentioned ▮▮▮▮▮▮ (Doc. 52), after which Knoll consulted with Gottlieb Rackman & Reisman ("GRR") attorneys (Doc. 55, 58).[14] After

---

[13]  Although ▮▮▮▮▮▮ had already counterclaimed, Knoll could not dismiss the action unilaterally as it had for other defendants; it needed Danrick's consent. (Pollner Decl. Ex. 12 at 5.)

[14]  Knoll's outside counsel need not be complicit for there to be fraud. *Amusement Indus*, 2013 WL 498724, at *2.

9

consulting with GRR in July 2003, Knoll researched certain ▮▮▮▮ (Doc. 56); third party use of the designs (what it called ▮▮▮▮) (Docs. 61, 66, 85); and intellectual property enforcement (Docs. 67, 74-76); and corresponded with counsel about Knoll's ▮▮▮▮ (Doc. 70) for months before ultimately filing its Applications in October 2003.

Jumping ahead to November 2009—before Knoll's April 2010 declaration to support incontestability—attorneys at GRR sent Michael Pollner at Knoll, the ▮▮▮▮ along with frequent updates. (Doc. 484, 518, 525.) In March 2010, immediately prior to voluntarily dismissing actions to deceive the PTO, Knoll sought counsel regarding ▮▮▮▮ (Doc. 371, 547, 549, 550, 551), Mod Lines by Design (Doc. 512), and ▮▮▮▮ (Doc. 457, 465, 466, 511, 514). Knoll also consulted with GRR regarding ▮▮▮▮ (Doc. 548), and in March and April 2010, obtained advice regarding ▮▮▮▮ (Doc. 561, 562, 563), ▮▮▮▮ (Doc. 564), and ▮▮▮▮ (Doc. 565, 566, 567, 568, 569, 570).

Although Knoll complains in its Opposition that Regency did not point to specific descriptions of the "privileged" documents to justify vitiating privilege, the descriptions are Knoll's own descriptions. Knoll is to blame for insufficient descriptions, not Regency.

## V.    CONCLUSION

Knoll could have avoided the time and expense of opposing this motion by just showing Regency the hidden documents. Instead, it carelessly accuses Regency of "speculation." For the reasons stated in Regency's Opening Brief and this Reply, Regency respectfully requests an order compelling Knoll to produce the documents, or in the alternative, for an in camera review.



| | | |
|---|---|---|
| Dated: | New York, New York.<br>March 28, 2013 | Respectfully submitted,<br><br>KENYON & KENYON LLP<br><br>*/s/ Michelle Mancino Marsh*<br>Michelle Mancino Marsh (MM 1494)<br>Natasha Sardesai-Grant<br>One Broadway<br>New York, New York 10004<br>212-908-6180<br>mmarsh@kenyon.com<br>nsardesai@kenyon.com<br><br>SEED IP LAW GROUP PLLC<br>Michael J. Freno (MF 6969)<br>Kevin Costanza (*pro hac vice*)<br>701 Fifth Avenue, Suite 5400<br>Seattle, Washington 98101<br>206-622-4900<br>mikef@seedip.com<br><br>*Counsel for Defendants and Counterclaim-Plaintiffs Regency Seating, Inc. and John Summerville* |